CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court
JUL 26 2004
John A. Clarke, Executive Officer/Clerk
By ________, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ANTHONY ESTRADA, JEFFREY MORGAN and HARVEY ROBERTS, Plaintiffs, vs. FED EX GROUND, Defendants. | No. BC 210130<br>STATEMENT OF DECISION |

This is a class action which has been bifurcated. The questions raised in this first phase are whether (1) single work area pick up and delivery drivers in California (hereafter referred to as "SWA") are independent contractors or employees of Fed Ex Ground (hereafter "FEG") which was previously RPS, Inc. and (2) if they are employees, whether they have already been indemnified for their expenditures at issue in this equity proceeding. The class of SWAs have been defined in prior proceedings as follows:

> "Each Pick Up and Delivery Contractor who at any time between May 11, 1996 and July 26, 2001 performed services for RPS, Inc. and/or its successors in the State of California as Pick-up and Delivery Contractor driving full-time (meaning exclusive of time off for vacation and/or illnesses) in a single service area dispatched from a California-based terminal pursuant to the terms of the Pick Up and Delivery Contractor driving full-time

(meaning exclusive of time off for vacation and/or illnesses) in a single service area dispatched from a California-based terminal pursuant to the terms of the Pick Up and Delivery Contractor Operating Agreement.

An individual shall be considered "full time" as that term is employed in the class certification order dated August 2, 2001 if such individual provided service to Defendant as a pick-up and delivery driver in a single service area and did not subcontract his or her service area for reasons other than vacation, sick leave, or other commonly excused employment absences.

Excluded from the class are the following categories of persons or entities:

(a) multiple route contractors who operate or have operated more than one service area for the period of time that they had contracts for more than one service area;

(b) corporate entities and/or Limited Liability Companies that have executed Pick-up and Delivery Contractor Operating Agreements with RPS, Inc. and/or its successors;

(c) temporary drivers working directly for RPS, Inc. and/or its successors, as well as those provided through the temporary employee agency referred to a "Pomerantz";

(d) drivers who work or worked directly for a Pick Up and Delivery Contractor and who have not entered into a Pick-Up and Delivery Contractor Operating Agreement with RPS, Inc. and/or its successors; and;

(e) line-haul drivers who have performed services for RPS, Inc, and/or its successors."

Plaintiffs both individually and as a class desire the court to determine them to be employees of FEG and not independent contractors pursuant to the factors set forth in <u>S.G. Borello & Sons</u> v. <u>Department of Industrial Relations</u> (1989) 48 Cal3d341,350-355.

The named plaintiffs Anthony Estrada and Jeffrey Morgan in this phase are deemed to be SWAs. However, named plaintiff Harvey Roberts is not a SWA, but a multiple work area pick up and delivery driver (hereafter referred to as "MWA") having two routes. MWAs are defined as "...multiple route contractors who operate or have operated more than one service area for the period of time that they had contracts for more than one service area..." and have been specifically excluded from the class. However, Mr. Roberts, as an individual plaintiff, seeks to

be determined as an employee of FEG.

The court will find as follows:

(1) that SWAs as defined in the class description are in fact employees and not independent contractors, which finding also includes Mr. Estrada and Mr. Morgan.

(2) that the SWAs have not been indemnified for any expenses at issue in this case, and

(3) that MWAs, including Mr. Roberts, are independent contractors and not employees and that Mr. Roberts will be dismissed from this action.

The court makes these findings based upon all of the standards set forth in Borello, but has been primarily guided by the factors of the right to control the manner and means of accomplishing the result desired, whether there has been integration into the FEG operation, and whether there is opportunity for profit or loss based upon managerial skill.

The court makes no value judgment as to whether independent contractor or employee status is a better business model or more beneficial for society. The court agrees with FEG that independent contractor status is a legitimate and acceptable mode of commerce.

Throughout the trial, the SWAs have been referred to as "contractors" or "drivers." The court will refer to them as "SWAs" and to multiple work area pick up and delivery drivers as "MWAs."

For there to be a class action, there should be commonality across the board. As such the

analysis of the court will be from this perspective and not localized anecdotes. It should be noted that FEG managers Thomas Campbell and Ed Leveque testified that for all practical purposes all of the terminals were run in a similar manner. Further the bulk of the evidence the court is relying upon was provided by testimony from FEG management.

The court finds that FEG, not only has the right to control, but has close to absolute actual control over the SWAs based upon interpretation and obfuscation. According to FEG, the core relationship between itself and the SWAs is the latter's independent contractor status which is repeatedly set forth in the contract or Operating Agreement, hereafter referred to as "OA." FEG's position is that the total relationship is encompassed in this document, which is a form contract that is non-negotiable in all of its facets. The OA specifically notes that the contract is one of independent contractor status and should be so interpreted. However as Borello points out, the denomination of independent contract status does not prevent the court from considering it to be in a contract of employment based upon the standards set forth in that opinion.

A close reading of the OA, which all SWAs must sign in order to be able to work for FEG, is comprised primarily of platitudes and guidelines. This, in effect, leaves its interpretation in the sole hands of FEG, without any meaningful recourse to the SWAs but with potential severe penalties and remedies that are intentionally kept uncertain and murky. In this regard, the court agrees with Robert Wood, the legal expert who testified in rebuttal as to control by uncertainty.

This description of the workings of the OA, which in effect gives almost absolute control

over the SWAs (and even its own employees) is borne out by the testimony of FEG's management team. It should be noted in the beginning that the OA is a brilliantly drafted contract creating the constraints of an employment relationship with SWAs in the guise of an independent contractor model. However, Timothy Edmonds, the head of Contractor Relations, Todd Yesland, the terminal manager of San Diego, and Michael Vickers, the terminal manager at Anaheim, all agreed that the OA was in effect a contract that relied upon a myriad of outside sources beyond the document itself in order to be implemented. In fact Mr. Edmonds testified that the following were sources outside of the OA which defined the relationship between FEG and the SWAs.:

(1) Verbal information

(2) Posters on bulletin boards

(3) Welcome packets sent to new SWAs.

(4) Information given to new SWAs as to customer expectations and company procedures

(5) Memoranda from management

(6) Audiotapes

(7) News Network and the "Scanner"

(8) Round Table Presentations

(9) Information from Contractor Relations personnel as they traveled to the various facilities

(10) Internet and Website

(11) Custom

(12) Under certain circumstances, the Operations Management Handbook (hereafter OMH) and the FedEx Ground Manual (hereafter FGM)

It should be noted that Mr. Edmonds testified that the above list was not exhaustive, but that it set forth the majority of sources outside of the OA defining the SWA-FEG relationship.

Of the above extra-contractual sources, the most problematic is the role of the manuals, the OMH and the FGM. It is the position of FEG that any extra contractual sources, especially the manuals, are not relevant, as the total SWA-FEG relationship is encompassed in the OA. This is, however, belied by the admission, as before discussed, by FEG management of a myriad of extra contractual sources which define this relationship. The OMH and FGM are laden with detailed descriptions of control by FEG over the SWAs as set forth by plaintiffs in Appendices B and C to their brief. Examples of said control in the OMH are:

(1) New terminal managers should study the OMH

(2) 9.5 hours minimum service is required

(3) Realigning, adding and deleting work areas is an ongoing part of management

(4) Flexing is often the best and only way to maximize service to the customer

(5) Prohibition against informal flexing

(6) SWAs are to return to their domiciled terminal daily

(7) Required business plan discussions

Examples of control in the FGM are:

(1) Requirements to wear uniforms

(2) FGM defined as setting forth policies and procedures

(3) Terminal managers to observe and note appearance of SWA and equipment

(4) Required customer service rides

The above are mere examples of control in the manuals. There are others of equal importance that have not been mentioned. FEG's insistence that the above manuals are not relevant is based upon the clauses in the OA that in effect make any act or declaration invalid that is contrary to the OA or independent contractor status. The assumption of FEG is that everyone should be able to determine if something is in conflict with said status. First of all, the OMH and FGM are not given to the SWAs, who are totally ignorant of their contents. (In the same manner business discussion notes which can be used by a terminal manager to recommend termination of a contract are not given to the SWAs.)

Secondly, to think that the average SWA would be sophisticated enough to so interpret

the OA is ludicrous. Mr. Edmonds testified that he teaches and reteaches a course to terminal managers on the interpretation of the OA that can last as long as 12 hours. To imagine that a SWA could easily master what takes management hours and hours to analyze is non-sensical.

To make it worse, FEG management, when they testified, could not agree upon the parameters of the OMH and FGM; that is, if they were mandatory, suggestive or partially both. There was testimony that the "informal flex" among SWAs, while forbidden by the OMH, was encouraged by FEG management. The bottom line appeared to be that the determination of the binding effect of any provision of the OMH and FGM was to be based upon a subjective evaluation by management using common sense, which determination would be very situational. However, if a manager made the wrong determination, it could conceivably cost that manager his or her job.

Added to this confusion relative to the binding effect of extra contractual sources, the OA itself is replete with vague terms of which the subjective interpretation by management could cost a SWA a reconfiguration of his or her route or the loss of his or her contract. See especially OA sections 1.2, 1.10, 1.12, 12.1, 12.3 and 18. Terms such as "a standard of service that is fully competitive," "reasonable efforts," "cooperate with," "foster the professional image and good reputation," "professional," and "proper decorum" create a broad leeway for interpretation. There is no way for a SWA to be able to rationally determine the ground rules, when they are

based on a platitudinal contract and a panoply of extra contractual sources, some of which are purposely made unknown to the SWA.

An example is section 13 of the OA which states that "This Agreement, the Addenda and Attachments shall not be modified, altered, changed or amended in any respect unless in writing and signed by both parties." However, Mr. Edmonds testified that if an addendum is added to a contract, SWAs who had signed OAs prior to that addendum could still be bound by it, if said new addendum was based upon "custom." Not only is this interpretation contrary to section 13 of the OA, as it adds change to the contract without written modification, but it also emphasizes the importance of the extra contractual sources of the SWA-FEG agreement. Certainly the relationship of SWA's and FEG is based upon far more than the OA itself.

As will be shown, the right to interpret the OA and the other matters is in the sole hands of FEG. By leaving such subjective interpretation to the discretion of management, the relationship between the SWAs and FEG ceases to be a partnership, metamorphasizing into a tightly controlled hierarchical employment model.

There has been extensive testimony on whether management illegally has forbidden SWAs to leave the terminal before the sort was completed; random road security audits; the requirement of returning the trucks to the terminal; the use of supplemental trucks; standards of appearance of both the truck and the SWA; penalties for failing to follow procedures in releasing

packages, alleged required attendance at Round Table meetings, and at safety meetings with attendance sheets; the use of bulletin boards; the role of memoranda from management; forced customer service rides; the role of customer complaints; the "min and the max;" mandatory times of service; the required use of pagers and cell phones; monthly reports; the use of Department of Transportation standards; the reconfiguration of routes that are supposed to be the proprietary rights of the SWA, allegations of forced unfair flexing; whether undue pressure was utilized by FEG to encourage or coerce the SWA to be part of the flex program, business support package and other FEG projects; and a myriad of other perceived wrongs.

There is no necessity for the court to determine if each alleged event was the purposeful design of FEG or the act of a "rogue" terminal manager. What is important is that by reason of the interpretive power of FEG, such actions can and do flourish with the tacit approval of higher management based upon the uncertainty of the standards which FEG determines to be applicable or non applicable, depending on the situation. When a route of an SWA can be reconfigured or a contract terminated because of a "service failure," the definition of which is determined by FEG based upon situational subjectivity and a panoply of sources, which may or may not be binding, there is almost absolute control. When a SWA is threatened by a management with "contract termination," it creates an environment, where a terminal manager can blasphemously refer to himself as the Almighty and wield power accordingly.

The lack of objective, precisely defined guidelines either reflects a totally disorganized business, which FEG is certainly not, or a highly motivated, well organized entity, which it is, that utilizes control and order in order to meet its successful economic goals. Thus, FEG unilaterally ordered its SWAs to work the Friday after Thanksgiving, which it had never done before, in order to be competitive with other package delivery services.

FEG guarantees itself the sole right to interpret by obfuscation of available remedies to those SWAs who would challenge its interpretation. These remedies are purposely left vague so that even FEG management is not certain of their range.

According to Mr. Edmonds, Contractor Relations is a liaison between FEG and SWAs in order to guarantee the independent contractor model. The purpose of Contractor Relations is to review recommendations for contract termination or non-renewal and to make certain that terminal managers do not overstep their bounds.

Although Contractor Relations claims to review contract termination recommendations "de novo," they normally only consider the file, which contains business discussion notes the SWA is not privy to, and without hearing the side of or reading any input from the SWA whose contract is being considered to be ended.

However, a closer look shows that Contractor Relations is nothing more than a mere branch of management. Mr. Edmonds works with, has his office close to, and reports to higher

management. He can be overruled by the Chief Operating Officer, the Senior Vice President of Operations and the President of FEG. Any decision by Contractor Relations is subject to higher management's approval or veto. Contractor Relations must be seen in a role akin to Human Relations over employees, wherein the highest levels of management have the final say.

Remedies beyond Contractual Relations are vague indeed. The only mention of such a remedy in the OA is in section 12.3 mandating arbitration as the sole means of redress for contract termination. Otherwise the OA is totally silent on the issue. Management differed dramatically in their testimony as to the available remedies. Mr. William Bradley, an attorney who participated in the drafting of the OA, testified that the sole and exclusive remedy was arbitration after termination and that for a SWA to obtain redress above and beyond Contractor Relations, he or she would have to have his or her contract terminated in order to seek relief by means of arbitration.

In contrast, Mr. Edmonds testified that SWAs could sue FEG for non-termination issues in a court of law and could even have contract non-renewal claims arbitrated. Mr. Edmonds did admit that he did not volunteer to SWAs any information about rights to arbitrate or sue.

This split of authority by FEG management on the scope of remedies was exacerbated by both sides having the court take judicial notice of litigation brought by SWAs against FEG, the great bulk of which was outside of California and thus not in the class purview. As pointed out

by plaintiffs, the majority of the out of state cases submitted by FEG were wrongful termination cases and further FEG did not provide evidence of its litigation position in the vast majority of those non California cases. In only one or two of the out of state cases might court action qualify as a remedy against FEG. However, plaintiffs proferred two California lawsuits by SWAs against FEG, in which FEG urged the court that the <u>sole remedy</u> as to all causes of action was <u>arbitration.</u> Whether or not access to the courts is allowed under the OA under FEG's interpretation is unclear: It appears that FEG takes either position when it best suits them, and thus the answer to this conundrum would be situational. The court finds that FEG has obfuscated the issue by making it uncertain as to which remedies exist in order to best serve its own purposes.

Since the OA is silent in the issue of court intervention, it would appear that such remedy is available. However, FEG certainly has not clarified the issue. This court has not been requested to and will not address the viability of the arbitration clause.

The above described methodology of FEG, in effect, gives it almost absolute unilateral control over contract termination to the point of it being the same as termination at will.

FEG contends that it should be able to retain its independent contractor status for SWAs, because unlike employees, the SWAs can buy and sell their routes, can come and go when they please, hire other drivers, be an "absentee SWA" and obtain additional routes for increased

profits.

While this argument has superficial appeal, a close examination reflects constraints imposed by FEG upon the above scenarios.

There is no doubt that FEG has control over who can purchase a route from or be hired as an employee by a SWA, the degree of which is disputed by the parties. Although FEG claims that limits on the sale of routes or hiring of other drivers is guided primarily by the Department of Transportation, such is contradicted by the testimony of Jeffrey Morgan, Harry Roberts, Nicholas Wanta, Chet Takeuchi, and John Kirkwood. Their testimony is corroborated by the OA itself. Section 18 requires for assignment of a route, "...a replacement contractor acceptable to Fed Ex Ground..." Leonard Revoir, the terminal manager at Oakland, testified that FEG had "some discretion" in determining whether an individual could purchase a route beyond Department of Transportation requirements, although he did not know the parameters of that discretion. Michael Vickers, a terminal manager, had written a business discussion note (Exhibit 93) stating in pertinent part that "...although the selling of route and business is none of my business, he was required to sell to only an RPS-approved buyer..." and "...although money is exchanged RPS will not recognize a purchase by an non-improved (sic) candidate..." The court finds that FEG has its own standards before approving a sale of a route or the hiring by a SWA of a driver.

Technically, SWA's may arrive at or leave the terminal at any time, but in fact they are

constrained by customer pick up and delivery windows contracted by the FEG sales force. Although SWAs may attempt to change the windows or modify them by contacting the customer, it is normally left to the latter's discretion. Paperwork requirements of FEG also limit the freedom of the SWAs as to their leaving and returning to the terminal. These customer windows also limit the flexibility of the SWA in determining his or her route.

One avenue to profit, as will be discussed later, is obtaining additional routes by a SWA in becoming an MWA. However, no SWA can become an MWA without the consent of FEG (unless without the knowledge of FEG, a person purchases another SWA's corporation that has additional routes). A new route cannot be created without the approval of FEG. The chance of a SWA to become a MWA is similar to that of an associate of a law firm, who has the opportunity some day to become a partner. The mere potential of that associate to become a partner does not transform his or her employee status to that of an independent contractor. Similar considerations apply to "absentee" drivers or supplemental trucks.

In conclusion, while on its surface the description of the SWA appears to be that of an independent contractor, the pervasive control by FEG creates an employment relationship.

Of importance to the court is the clear evidence that SWAs are totally integrated into the FEG operation. SWAs are defined in the OA as a "network" and are to "...foster the professional image and good reputation of Fed Ex Ground...." (OA, Background Statement, Section 1.10(e)).

The SWAs wear required FEG uniforms and drive specifically mandated FEG logo laden trucks. The SWAs are long-term in years of service as testified to by defense economist Dr. Ali Saad.

Under section 11.1 and 11.2 of the OA, contracts are presently set for one, two or three year terms, automatically renewable for one year unless FEG gives notice of non-renewal.

The SWAs are paid with weekly "settlement" checks that include various deductions. Portions of the CCS bonus are based upon terminal as opposed to individual performance. The SWAs normally park their trucks in the same spot on a daily basis, usually have their trucks loaded by FEG employees and interact with the terminal managers. For all practical purposes, by the nature of the work, the SWAs are engaged in the exclusive and full time pick up and delivery service for FEG and are indentified as such. FEG also provides business cards for the SWAs with its logo.

Most important of all, the court finds that the work of the SWAs is essential to FEG's core business operation, the pick up and delivery of packages. If "lightning" were to strike so that there would be no FEG, there would in fact be nothing left for the SWAs to do and they suddenly would be totally bereft of business. This is because the SWAs would lack the terminals where the packages are picked up or delivered , the customers obtained by the FEG sales force and the FEG logistical support which is the crux of their daily work.

On the other hand, if "lightning" were to strike and there were suddenly no SWAs, FEG

would lose its principal means of pick up and delivery. FEG counters that if the SWAs were to suddenly disappear, it would be able to regroup using cartage agents and MWAs who would enter a "feeding frenzy" in buying routes. The court does not find this response to be credible. Unlike SWAs, cartage agents are truly independent and would not necessarily wear the FEG uniform or have their trucks bear the FEG logo. MWAs would not be able to fill the breach. As pointed out by various witnesses including Mr. Edmonds, serving additional routes is expensive, involving the cost of hiring qualified drivers and purchasing or leasing trucks. In addition, David Brady, a MWA, noted that slow growth in obtaining additional routes was the hallmark of building a good business. There is also difficulty in getting additional qualified drivers.

Looking at FEG's major competition in the arena of package pick up and delivery service, UPS, the US Post Office and DHL/Airborne, the primary model is that of an employment relationship, although the US Post Office and DHL/Airborne also use independent contractors that are more akin to cartage agents. Looking objectively at FEG's model, it is similar to the US Post Office and DHL/Airborne, as FEG in effect utilizes employees (SWAs) and independent contractors (MWAs and cartage agents). Thus the SWAs are integral to FEG.

The court finds that there is little or no opportunity for profit or loss as a SWA, but also determines that there are tremendous opportunities in this regard for MWAs. At this point, the SWAs and MWAs part company. Even though the MWAs are under strict controls by FEG,

their profits are unlimited, making them true independent contractors. John Chapman, David Brady and Joanie Rios, all MWAs, testified as to their enthusiasm for their entrepreneurial opportunities for making good money. Unlike the SWA, who in effect is just a package pick up and delivery person, a MWA has the opportunity to hire drivers and slowly but surely create a little financial empire under the aegis of FEG.

In light of this, plaintiff Harry Roberts' case should be dismissed. He urges, that although he is a MWA, he only has two routes and that he should be deemed an employee. The court cannot engage in such a narrow analysis. FEG needs a "bright line" in order to conduct its business as to the status of its workers. Whether a MWA has two or six routes is not relevant as there is still a potential opportunity for profit or loss, that is not, as shall be discussed, affordable to SWAs.

It is true that a person hiring other workers can be deemed to be an employee and their workers employees of the person or entity to whom they provide service S.G. Borello & Sons v. Department of Industrial Relations supra, 48C3d341,356-358 Rinaldi v. W.C.A.B (1991) 227CA3d756,762. However in those cases, there was no opportunity for profit. It has been shown that there is opportunity for both profit and loss as a MWA, no matter the number of routes. As such MWAs will be deemed to be independent contractors and Mr. Roberts is hereby dismissed from this lawsuit.

In contrast, the evidence is clear that there is little or no room for economic opportunity by SWAs. The SWA is given a list of customers to service on a route, checks in to the terminal, services the customers and returns to the terminal. Randy Eller, the managing director of Field Human Resource Programs for FEG, recognized that a benefit to being a SWA was that FEG "...let them (the SWAs) know that we had a sales force through the company that sold, they didn't have to sell..." (Deposition of Randy Eller, p77). In addition, SWAs were recruited for their driving skills and strength and not business management. The only skills a SWA need have is to be a good driver, be strong enough to pick up and deliver packages, be able to get along with people and be able to fill out paperwork. No other specialized skills are necessary.

The evidence was replete that the SWAs had little or no entrepreneurial opportunities. One of the problems in dealing with the concept of the economic value of the SWA "contract" is that it is in effect a "job." As noted, the SWA reports to the terminal, picks up and delivers packages and returns to the terminal with a customer base determined by the FEG sales force. There has been testimony by each side as to the financial value or lack thereof of said contracts, but both have missed the mark. The contract has some value, the value of a "job" with a steady income, nothing more and nothing less. A "job" with its concomitant ability to make a living always has some worth. The question was raised why did SWAs remain with FEG when there was the possibly of employment, higher pay and less risks with UPS. It can easily be inferred

that just because UPS hires drivers, not everybody applying will get those jobs. Good jobs are at a premium, and if an individual does not obtain one, that person still has to make a living and will settle for less. Working for FEG as a SWA is a "living" and the income which may or may not be competitive is acceptable. In addition, once a SWA works for FEG it is difficult to leave for fear of breaching the OA and being saddled with payments for a truck.

Furthermore FEG gives the SWAs a "safety net," requiring very little money up front, the Business Support Program and the Contractors Assistance Program, (which in effect gives loans for operating expenses deducted from the SWA's checks) and Service Guarantee Accounts.

The mere fact that, with FEG's permission, a SWA could become a MWA does not change the opportunity for profit status, just as noted before, the chance for an associate to become a partner does not defeat that attorneys' status as an employee of a law firm. The court therefore concludes that there is little or no entrepreneurial aspect in being a SWA.

The court has weighed and carefully considered each of the Borello factors in reaching its conclusion and many of those standards have been discussed in its above analysis of control, integration and entrepreneurial opportunities. The court need not and will not mention specifically each of these factors, although it has considered them. However, the court does note the following aspects of FEG's relationship with the SWAs.

Although the SWAs supply and upgrade the instrumentalities of their work in the truck

and invest in their materials, FEG is involved deeply in the process, recommending leases of trucks and the type of truck to be obtained, the Business Support Package to allow the SWAs to obtain scanners, uniforms and others items required by FEG, the Contractor Assistance Program for loans relating to operating expenses and Service Guarantee Accounts. These programs place a great deal of control in the hands of FEG so that the SWAs can obtain the equipment, items and upgrades in order to be able to do their work. The court agrees with plaintiffs in their description of this system of safety nets as being similar to that of a "company store," wherein FEG deducts monies from the weekly settlement checks so that SWAs can be provided with the necessities for their job.

As to whether or not the parties believed they were creating an employer - employee relationship it would seem that the SWAs thought that they were either investing in a "job" or believed that they would be independent contractors, only to find out by reason of the FEG controls that they were being treated like employees. The court finds that in entering the relationship, FEG purposely created controls of an employment nature, hoping that in spite of those strictures, the status would still be seen and considered to be that of an independent contractor.

The court having weighed and considered the Borello factors, as discussed above, finds the SWAs to be in an employment relationship with the FEG, which includes plaintiffs Mr.

Estrada and Mr. Morgan and the certified class in so much as they meet the class definition.

FEG argues that the SWAs are estopped from denying independent contractor status by reason of their certifying that condition in the signing of insurance applications, in renewing OAs after the class was certified and notice sent, and in filing taxes. The court rejects these arguments as the above events were forced on the SWAs by FEG, in that the latter drafted the OA, helped provide the insurance and gave out forms only for independent contractors. As stated in Borello on page 349 of the opinion, "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenaced."

FEG urges that even if the SWA's are deemed to be employees, the OA cannot be severed as the independent contractor concept is central to that document. However, Section 15 of the OA has a savings clause, stating, "If any part of this Agreement is declared unlawful or unenforceable, the remainder of this Agreement shall remain in full force and effect." It would seem by a reading of the OA that it could be severed and still be in effect to serve as an employment contract. However it is not the function nor duty of this court at this time to determine which provisions or sections have or have not survived after the severance.

FEG urges that even if the SWAs are deemed to be employees that they have already been indemnified the expenses they seek under Labor Code section 2802. No evidence was presented to support this position and no language in the OA would bolster that theory. Rather

all witnesses testified that the SWAs were responsible for their own expenses.[1]

In conclusion the SWAs as defined herein are deemed to be employees and there has been no indemnification of the expenses sought in the accounting. As such, there will be a phase two of these proceedings on the accounting issues.

Dated: 7/26/04

Howard J Schwab
HOWARD J. SCHWAB
Judge of the Superior Court

[1] FEG urges that Brian Jacobs and any other SWAs who operated tractor-trailers should be excluded from the class. Those individuals who have the same OA as the SWAs will remain in the class.